UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
PIKEVILLE

CIVIL ACTION NO. 7:16-CV-251-EBA

RAVI RAITHATHA,                                                                                            PLAINTIFF,

V.                   **MEMORANDUM OPINION AND ORDER**

UNIVERSITY OF PIKEVILLE, et al.,                                                DEFENDANTS.

## INTRODUCTION

Plaintiff, Ravi Raithatha, brought this action alleging that Defendants—the University of Pikeville d/b/a/ the Kentucky College of Osteopathic Medicine, Dr. Boyd Buser, and Dr. Tracy Soltesz—discriminated against him on the basis of his race and national origin when he was expelled from the University of Pikeville's College of Osteopathic Medicine. [R. 1-2; R. 1-1 at 3–6]. Defendants seek summary judgment, [R. 37], and the matter has been fully briefed. For the reasons that follow, this Court will grant the Defendants' Motion for Summary Judgment and dismiss this action with prejudice.

## FACTUAL BACKGROUND & PROCEDURAL HISTORY

Prior to his admission to the University of Pikeville Kentucky College of Osteopathic Medicine, hereinafter "the College," Plaintiff had been expelled from the Touro College of Osteopathic Medicine for poor academic performance. [R. 37-1 at 5 ¶ 2 (citing R. 35, *Deposition of Ravi Raithatha*, at 8–9); *see also* R. 35-1 at 6, 8]. Plaintiff was admitted to the College for the fall 2012 semester, but, because of his academic history, his admission was permitted only following the completion of multiple courses at Eastern Kentucky University and a personal meeting with Dr. Buser, where Plaintiff's academic integrity and personal character were

1

evaluated. [R. 37-1 at 6 ¶ 3, 4]. Plaintiff's performance for the first two years of his attendance at the College was satisfactory. [R. 33 at 28–29].

During the spring 2015 semester, as a part of his third-year curriculum, Plaintiff was required to complete clinical rotations at Grandview Medical Center in Dayton, Ohio. While there, he was required to record his activities in a "log" for purposes of grading. [R. 37-1 at 6 ¶ 2; R. 37-8 at 12, (citing R. 35, *Deposition of Ravi Raithatha*, at 10)]. Plaintiff falsified his case logs for that clinical rotation, and he admitted as much before the College's Promotion and Matriculation Committee at a hearing on April 8, 2015. [R. 37-1 at 2; R. 37-12 ("I should never have logged days in which I was not working in the office, and agree that I should be punished for my actions."); R. 42 at 2 ("Plaintiff admitted his error.")]. The following day, the Committee recommended that Raithatha be given a failing grade, placed on temporary academic probation, permanent disciplinary probation, suspended from the College for six months, and required to enroll in an ethics course. [R. 37-6; R. 37-11; R. 37-12; R. 37-13].

Before the punishments were finally imposed, Plaintiff appealed the Committee's recommendation to Dr. Buser by submitting a letter and making a personal appearance. [R. 37-12; R. 37-13]. On May 4, 2015, the recommended punishments were approved by Dr. Buser as within the authority of the Promotion and Matriculation Committee. [R. 37-13; *see also* R. 37-6 at 7 (outlining the Promotion and Matriculation Committee's authority to punish troubled students)].

Although Plaintiff remained on academic and disciplinary probation, he was removed from his suspension five months early, on June 15, 2015. [R. 37-14; R. 42-1]. Dr. Soltesz worked with Raithatha to aid him in enrolling in the ethics course required by the Promotion and Matriculation Committee and Dr. Buser. [R. 37-15]. And, on request, Plaintiff was permitted by Dr. Buser to resume clinical rotations at the Hazard ARH Regional Medical Center on August 31, 2015, months

ahead of schedule. [R. 35 at 24, 29 ¶ 15–16; R. 37-18; R. 42-3]. Before he could perform his rotations, however, Hazard ARH Regional Medical Center required Plaintiff to pass a drug test. [R. 35 at 31 ¶ 1–6; *see also* R. 37-8 at 10; R. 33 at 40]. Plaintiff failed. [R. 35-27; R. 35 at 31].

Due to the fact that Plaintiff failed Hazard ARH's drug test, Hazard ARH dismissed Plaintiff from its campus, and Plaintiff was unable to complete his clinical rotation. [R. 35 at 31 ¶ 15–17]. Plaintiff was again called for a hearing before the Promotion and Matriculation Committee on September 23, 2015. [R. 35 at 33–36; R. 37-19]. Following the hearing—where Plaintiff admitted to using drugs while already on academic and disciplinary probation, and suspended from the College—the Committee recommended his expulsion. [R. 35 at 33–36; R. 37-19; R. 37-1 at 12 ("I mean what you said is true . . . I know it was a huge mistake . . . I did it.")]. Plaintiff appealed the Committee's recommendation to Dr. Buser, and on October 13, 2015, Dr. Buser met with him to discuss the appeal. [R. 35 at 36 ¶ 10–11; R. 37-19; R. 37-20; *see also* R. 37-6 at 4–5 (indicating the use of drugs to be in direct contravention of College policy)]. Dr. Buser upheld Plaintiff's expulsion as within the authority of the Promotion and Matriculation Committee. [R. 35 at 37 ¶ 6– 8; R. 37-20; *see also* R. 37-6 at 6–8 (outlining many reasons for which students may be expelled from the College, including "[f]ailure of more than one clinical rotation"); R. 37-8 at 10 ("A positive [drug] test result may become grounds for dismissal.")].

Thereafter, Plaintiff filed this suit, alleging he was "subject to disparate treatment due to his race and national origin." [R. 1-1 at 4 ¶ 15].

## **SUMMARY JUDGMENT STANDARD**

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any

3

material fact and the movant is entitled to judgment as a matter of law." *Id.* In making the determination as to whether summary judgment is warranted, "a court must view the evidence 'in the light most favorable to the opposing party.'" *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* (quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In such a case, summary judgment is warranted. *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). But there is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* As such, in some cases, the moving party may be "'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* (quoting Fed. R. Civ. P. 56). Such a motion "therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). This is so because "[o]ne of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Id.* at 323–24. "[T]he existence of a mere scintilla of evidence in support of the non-moving party's position will not be sufficient; there must be evidence on which the jury could reasonably find for the non-moving party." *Sutherland v. Mich.*

*Dept. of Treasury*, 344 F.3d 603, 613 (6th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).

## I. COUNT ONE: KENTUCKY CIVIL RIGHTS ACT

Defendant alleges the University of Pikeville, hereinafter "the University," and thus the College by implication, is a public accommodation under K.R.S. § 344.130, [R. 1-1 at 2 ¶ 21]; that "[a]s a public accommodation, the Defendant cannot discriminate against the Plaintiff due to his race or national origin," [*Id.* at 2 ¶ 22]; that "the dismissal of the Plaintiff by the Defendant UP-KYCOM subjected the Plaintiff to desperate (sic) discipline due to his race and national origin," [*Id.* at 3 ¶ 23]; and that "[t]he dismissal of the Plaintiff from the Defendant University violated K.R.S. § 344.130" and caused Plaintiff to incur damages. [*Id.* at ¶ 25].

### A. Whether the College is a Public Accommodation for Purposes of the Kentucky Civil Rights Act

K.R.S. § 344.130 defines public accommodations as "any place, store, or other establishment, either licensed or unlicensed, which supplies goods or services to the general public or which solicits or accepts the patronage or trade of the general public or which is supported directly or indirectly by government funds." K.R.S. § 344.130, however, goes on to exclude private clubs, certain small "boarding houses," and religious institutions from its ambit. *Id.* K.R.S. § 344.130 is but a section of a much larger body of law, the Kentucky Civil Rights Act (the "Act"). K.R.S. § 344.010 *et seq.* Kentucky courts have "construed the Act liberally." *Commonwealth of Kentucky v. Pendennis Club, Inc.*, 153 S.W.3d 784, 787 (Ky. 2004). (citing *Dep't of Corr. v. Furr, Ky.*, 23 S.W.3d 615, 617 (Ky. 2000)); *see also Toyota Motor Mfg., U.S.A., Inc. v. Epperson,* 945 S.W.2d 413, 415 (Ky. 1997). "Exceptions to the Act's coverage are interpreted narrowly." *Id.* (citing *Kreate v. Disabled Am. Veterans*, 33 S.W.3d 176, 181 (Ky. Ct. App. 2000)). K.R.S. § 344.020, the defining provision of the Act, requires a broad statutory interpretation of the Act to

fully effectuate its purposes. *Pendennis Club, Inc.*, 153 S.W.3d at 787. That section provides the following statement:

> The general purposes of this chapter are:
>
> To safeguard all individuals within the state from discrimination because of familial status, race, color, religion, national origin, sex, age forty (40) and over, or because of the person's status as a qualified individual with a disability as defined in KRS 344.010 and KRS 344.030; thereby to protect their interest in personal dignity and freedom from humiliation, to make available to the state their full productive capacities, to secure the state against domestic strife and unrest which would menace its democratic institutions, to preserve the public safety, health, and general welfare, and to further the interest, rights, and privileges of individuals within the state. . . .

K.R.S. § 344.020(1)(b). The same section, at §§ (1)(a) provides the Act is to be interpreted "within the state of the policies embodied in the . . . Americans with Disabilities Act of 1990 (P.L. 101-336)." *Id.* The Americans with Disabilities Act provides "[t]he following private entities are considered public accommodations for purposes of this subchapter, if the operations of such entities affect commerce . . . a nursery, elementary, secondary, undergraduate, or *postgraduate private school*, or other place of education." 42 U.S.C. 12181(7)(J) (emphasis added).

The Kentucky Court of Appeals "interpret[s] KRS 344.130 as creating a two-prong test for determining what constitutes a place of public accommodation." *K.M. ex rel. B.M. v. Fayette County Public Schools*, 2003 WL 21771952, 4* (Ky. Ct. App. 2003). Under the Kentucky test, a "place of public accommodation is: [1] any place, store, or other establishment; that [2] either (a) supplies goods or services to the general public; (b) solicits or accepts patronage or trade of the general public; or (c) is supported directly or indirectly by government funds." Some schools have been interpreted as a place of public accommodation under the Kentucky Civil Rights Act. *Id.* at 5. Nonetheless, the parties to this case have failed to demonstrate whether a private school may or may not be a public accommodation solely for the purpose of the application of the Kentucky Civil

6

Rights Act. Because the parties have not conclusively so shown either outcome, this Court takes no position on the question of whether the University, or private schools generally, may be a public accommodation for the sole purpose of application the Kentucky Civil Rights Act. In any event, such a finding is unnecessary: for even if the University were a public accommodation for purposes of the Act, Plaintiff's claims remain insufficient for relief.

### B. Whether Plaintiff States a Claim Under the Kentucky Civil Rights Act

First, although Plaintiff argues his claim arises under K.R.S. § 344.130, [R. 1-1], this Court will note that K.R.S. § 344.130 defines public accommodations, but does not forbid their discriminatory behavior. K.R.S. § 344.120 forbids discriminatory behavior by public accommodations as defined by K.R.S. § 344.130. For that reason, this Court will evaluate Plaintiff's claim as if it had been properly filed under K.R.S. § 344.120.

The violation of K.R.S. § 344.120 is a "straightforward proposition in situations where a person is ordered off the premises of a business establishment otherwise open to the public, or service is otherwise refused or limited, for no reason except the person's protected status." *Lexington Fayette Urban Cnty. Human Rights Comm'n.* v. *Hands on Originals, Inc.*, 2017 WL 2211381, 5* (Ky. Ct. App. 2017). "A university could not, for example, refuse to enroll a student because the student is Hispanic." *Id.* Although distinct in arising under state—not federal—law, claims under K.R.S. § 344.120 "should be analyzed via the same framework" as one arising under 42 U.S.C. § 1981. *Miller v. Freedom Waffles, Inc.*, 2007 WL 628123, 5* (W.D. Ky. 2007) (Heyburn, J.); *see also Camara v. Schwan's Food Mfg., Inc.*, Case No. 04-121, 2005 WL 1950142 (E.D. Ky. 2005) (noting similarities between the Kentucky Civil Rights Act and Section 1981). "[T]he Court is unable to find any precedent that would dictate otherwise." *Miller*, 2007 WL 628123, 5*. Again, assuming without finding that the University is a public accommodation for

purposes of the Kentucky Civil Rights Act, this Court shall analyze Plaintiff's claims under K.R.S. § 344.120 as if they had been filed under Section 1981.

The Sixth Circuit "has held that to prevail in a claim of race discrimination under § 1981 relying on circumstantial evidence, a plaintiff must meet the burden-shifting standard of proof for Title VII cases established by the Supreme Court." *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 868 (6th Cir. 2001); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248 (1981)." "Under this standard, a plaintiff must first establish a prima facie case of discrimination by a preponderance of the evidence." *Christian*, 252 F.3d at 868. "The burden of production then shifts to the defendant," who must provide a "legitimate, non-discriminatory" purpose for the allegedly discriminatory behavior. *Id.* "To prevail, the plaintiff must then prove by a preponderance of the evidence that the defendant's proffered reason is not its true reason but a pretext for discrimination." *Id.* It follows that where the plaintiff cannot rebut the defendant's claims by a preponderance of the evidence, the plaintiff's claims will necessarily fail.

Various tests for a prima facie case under Section 1981 have been established by the Sixth Circuit under *McDonnell Douglas*, each incorporating the minutia of unique scenarios. "While § 1981 is generally invoked in the employment context for, e.g., claims of hostile environment, failure to promote, or wrongful dismissal, litigants have also brought suit under the statute for claims of discrimination in retail and service settings." *Id.* But no test has ever been developed in the Sixth Circuit "for a prima facie case of discrimination under § 1981 outside of the employment context." *Id.* This is no matter, however, for "[t]he *McDonnell Douglas* formulation 'was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to

8

evaluate the evidence.'" *Daugherty v. City of Danville, Ky.*, 856 F.2d 193, 6* (6th Cir. 1988) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)).

*McDonnell Douglas*—a failure to hire case—outlined the traditional standard by which a prima facie case is established under Section 1981:

> The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of racial discrimination. This may be done by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*McDonnell Douglas*, 411 U.S. 792, 802. This test has been adapted to the employee discharge context, which is analogous, though not precisely equivalent, to this case. In a discharge case, a Section 1981 claimant must show (1) that he or she is a member of a protected class, (2) that he or she suffered an adverse action, (3) that he or she was qualified for their position, and (4) that he or she was replaced by or treated differently than similarly situated members of the unprotected class. *Warfield v. Lebanon Correctional Inst.*, 181 F.3d 723, 728–29 (6th Cir. 1999); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998); *Morvay v. Maghielse Tool & Die Co.*, 708 F.2d 229, 233 (6th Cir. 1983). The plaintiff is required to "demonstrate that he or she is similarly-situated to the non-protected employee in all relevant respects." *Ercegovich*, 154 F.2d 353. "Failure to prove any one of these elements by a preponderance of the evidence mandates a dismissal of the plaintiff's suit." *Morvay*, 708 F.2d at 233.

Plaintiff has established that he is a member of a protected class. Plaintiff is an African-American male with Indian heritage. [R. 37-1 at 5 ¶ 1]. Plaintiff has also shown that he was subject to adverse action, including his eventual expulsion. [R. 35 at 33–36; R. 37-12; R. 37-11; R. 37-13; R. 37-19]. But this was only after Plaintiff admitted to falsifying his clinical rotation logs—thereby

9

failing his pediatric rotation for cheating—and then admitted to having abused drugs after having already been suspended and placed on academic and disciplinary probation for said cheating. [R. 37-12 ("I should never have logged days in which I was not working in the office, and agree that I should be punished for my actions."); R. 37-1 at 12 ("I mean what you said is true . . . I know it was a huge mistake [to abuse drugs while on probation and suspension] . . . I did it.")]. It is for this reason that Plaintiff fails to establish the third element of a prima facie case under the Kentucky Civil Rights Act: that he was qualified for his position at the College.

"A plaintiff must do more than simply impugn the legitimacy of the asserted justification for her termination." *Warfield v. Lebanon Correctional Inst.*, 181 F.3d 723 (6th Cir. 1999). Plaintiff has not. Plaintiff had notice that cheating and the abuse of drugs were in violation of the policies of the College. Such was included in the Handbooks Plaintiff was provided. [R. 37-6, *College Student Handbook*, at 4–8 (outlining many reasons for which students may be expelled from the College, including "[f]ailure of more than one clinical rotation"); R. 37-8, *College Clinical Rotations Manual*, at 10 ("A positive [drug] test result may become grounds for dismissal.")]. Plaintiff acknowledges his notice of these College policies, and the prohibition of his adverse behaviors. [R. 37-12 ("I should have followed the letter of the Student Handbook."); *see also* R. 37-6 at 6–8; R. 37-8 at 10]. Plaintiff also admitted to both cheating *and* abusing drugs. [R. 37-12; R. 37-1 at 12; *see* R. 35 at 92, 119–121]. Either violation on its own was sufficient grounds for potential expulsion from the College. [R. 37-6 at 6–8; R. 37-8 at 10]. In such a case—in the presence of admitted policy violations, both of which were adequate grounds for expulsion—Plaintiff cannot legitimately claim that he was qualified to remain enrolled at the College.

Plaintiff has also failed to demonstrate the fourth element of a prima facie case under the Kentucky Civil Rights Act: that he was replaced by or treated differently than a similarly situated

member of an unprotected class. *Warfield v. Lebanon Correctional Inst.*, 181 F.3d 723, 728–29 (6th Cir. 1999). Plaintiff notes in his Response to Defendants' Motion for Summary Judgment that three students aside from Plaintiff received DUIs or were otherwise arrested while attending the College. [R. 42 at 8]. Plaintiff fails to show, however, that these arrests were due to the abuse of drugs, rather than merely alcohol. [*Compare* R. 37-6 at 4 (permitting the use of alcohol on campus in limited situations, and not baring it off campus to those of legal age), *with id.* at 5 (baring the use of drugs and noting the use of "illegal drugs is subject to disciplinary action."). Plaintiff also fails to allege that any of these students committed those offenses while already subject to disciplinary and academic probation following the failure of a course for cheating, and the early return from suspension from the College for the same. [R. 42 at 8]. Dr. Buser, in fact, testified at his deposition that no other student at the College had ever committed equivalent violations. [R. 33 at 62]. Plaintiff also makes these allegations without evidence in support of his statements. [R. 42 at 8]. Plaintiff has neither attached documents to support his propositions, nor cited his source of knowledge. [*Id.*; *but see* R. 34 at 16 ¶ 7–18 ¶ 5].

It is well-established that a moving party may be "'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). A Plaintiff "must produce sufficient evidence from which the jury may reasonably reject the [defendant's] explanation." *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1083 (6th Cir.1994). Plaintiff has failed to establish two elements of a prima facie case under the Kentucky Civil Rights Act. Such an unfounded claim is not sufficient to overcome the standard of review for a summary judgment motion. *Sutherland v. Mich. Dept. of Treasury*, 344 F.3d 603, 613 (6th Cir. 2003). As such, Plaintiff's claim under the

Kentucky Civil Rights Act is insufficient for relief and Defendants are entitled to summary judgement as a matter of law. *Miller v. Freedom Waffles, Inc.*, 2007 WL 628123, 5* (W.D. Ky. 2007) (Heyburn, J.); *Morvay v. Maghielse Tool & Die Co.*, 708 F.2d 229, 233 (6th Cir. 1983).

## II. COUNT TWO: XIV AMENDMENT DUE PROCESS RIGHTS

Plaintiff alleges that the University, and thus the College by implication, violated his due process rights under the Fourteenth Amendment of the United States Constitution. Plaintiff asserts that Defendants denied Plaintiff procedural Due Process in his dismissal from the University, causing him economic damages as well as embarrassment and humiliation. [R. 1-1]. Plaintiff prays that this "Court find the Defendant violated the Plaintiff's right to Due Process under the 14th Amendment to the U.S. Constitution enforced by 42 U.S.C. § 1983 when Defendant dismissed him from the University." [*Id.*].

It is true that the Due Process Clause of the Fourteenth Amendment guarantees fair procedure, or procedural due process, whenever there is an unjustified deprivation of some right or benefit by a state actor. *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). "[T]he injury caused by a *justified* deprivation, including distress, is not properly compensable under § 1983." *Carey v. Piphus*, 435 U.S. 247, 263 (1978) (emphasis added); *but see id.* at 266–67 ("[W]e believe that the denial of procedural due process should be actionable for nominal damages without proof of actual injury."). The initial inquiry of a Section 1983 action further limits the remedy's application. Two elements must be "present: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds by Daniels v. Williams*. 474 U.S. 327, 330–31

(1986) (negligence is insufficient for a due process violation). Thus, Section 1983, and the Fourteenth Amendment generally, are only applicable to actions fairly attributable to the state.

"[T]he Fourteenth Amendment, which prohibits the states from denying federal constitutional rights and which guarantees due process, applies to acts of the states, not to acts of private persons or entities." *Rendell-Baker v. Kohn*, 457 U.S. 830, 837–38 (1982) (citing *Civil Rights Cases*, 109 U.S. 3, 11 (1883); *Shelley v. Kraemer*, 334 U.S. 1, 13 (1948)). "In cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment." *United States v. Price*, 383 U.S. 787, 794, n. 7 (1966). As such, private parties may not be subject to suit for a violation of a plaintiff's right to procedural due process unless "the alleged infringement of federal rights [is] 'fairly attributable to the State.'" *Rendell-Baker*, 457 U.S. at 838 (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). "[T]he deprivation must be caused by the exercise of some right or privilege created by the state or by a rule of conduct imposed by the state or by a person for whom the State is responsible." *Lugar*, 457 U.S. at 937. And "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Id.*

Although "[i]t is undisputed that [] Fourteenth Amendment protections, codified in 42 U.S.C. § 1983, are triggered only in the presence of state action," "a private entity *can* be held to constitutional standards." *Lansing v. City of Memphis*, 202 F.3d 821, 828 (6th Cir. 2000) (emphasis added). This is so, however, if and only if such private entity's "actions so approximate state action that they may be fairly attributed to the state." *Id.* (citing *Lugar*, 457 U.S. at 937). "The Supreme Court in *Lugar* identified a two-part approach to the question of "fair attribution," effectively requiring that the action be taken (a) under color of state law, and (b) by a state actor." *Id.*; *see also Lugar*, 457 U.S. at 937. The Sixth Circuit applies "three tests to help in determining when the

13

*Lugar* conditions are met. These are: (1) the public function test; (2) the state compulsion test; and (3) the symbiotic relationship or nexus test." *Id.* "The public function test requires that 'the private entity exercise powers which are traditionally exclusively reserved to the state, such as holding elections or eminent domain.'" *Id.* (quoting *Wolotsky v. Huhn*, 960 F.2d 1331, 1335 (6th Cir.1992)). "The state compulsion test requires that a state 'exercise such coercive power or provide such significant encouragement, either overt or covert, that in law the choice of the private actor is deemed to be that of the state.'" *Id.* (quoting *Wolotsky*, 960 F.2d at 1335). Finally, "[u]nder the nexus test, the action of a private party constitutes state action when there is a sufficiently close nexus between the state and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the state itself." *Id.* (internal citations omitted). "If the action of the respondent school is not state action, our inquiry ends," and the court need not reach the question of whether there was a deprivation of a legally or constitutionally protected right. *Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982).

The University fails to qualify as a state actor under each of these tests. First, the University fails under the public function test. The University performs no functions traditionally exclusively reserved to the state; the University neither holds public elections nor exercises imminent domain. Further, the University has always been private. [R. 4 at 1 ¶1; R. 37-1 at 2 ¶ 2]. Second, the University fails under the state compulsion test. It is true that the University receives some government funding, but this funding is minimal. "[T]he only government funds the University receives comes in the form of student loans and financial aid, grants, and some USDA building loans." [R. 37-1 at 21 (citing R. 33 at 9–10 ("[T]he operating budget would be—the federal portion, federal support portion of that would be, I'm sure, less than five percent."))]. Where the funding received by the government is insufficient on its own—5% of the overall operating budget—of

being used to compel the University to take any specific action, and there is no other formal state association, [R. 37-1 at 2 ¶ 2], the University cannot be said to satisfy the state compulsion test.

Finally, the University fails under the nexus test. The nexus test may be the most flexible of the three tests herein discussed. *Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961), assures a generally broad interpretation of the nexus test. There, a privately owned restaurant was deemed to be an agent of the state when it barred a man of color from entry, where the restaurant was merely located within a state-owned parking garage. *Id.* Despite this generally broad interpretation, however, the Supreme Court has defined the test narrowly with regard to private schools. *Rendell–Baker v. Kohn*, 457 U.S. 830, 830–32 (1982), found a private school—where "nearly all" of the students were referred by a state agency, the school was heavily regulated under state laws, and public funding "accounted for at least 90%, and in one year 99%, of [the] school's operating budget"—to be a private actor for purposes of the Fourteenth Amendment and Section 1983. Thus, a private school's discharge decisions are not attributable to the state, even where the school is extensively populated, regulated, *and* funded by the state, unless some other factor dictates otherwise. *Rendell–Baker v. Kohn*, 457 U.S. at 840 (cited in *Lansing v. City of Memphis*, 202 F.3d 821, 830 (6th Cir. 2000)). Here, *Rendell–Baker* dispenses with the entire Fourteenth Amendment question. The University may receive public funds, but the University is not an agent of the government. [R. 37-1 at 21; R. 33 at 9-10]. A private "school's receipt of public funds does not make the discharge decisions acts of the State." *Id.* Thus, "our inquiry ends." *Id.* at 838.

Plaintiff alleges there is some support to be found for the proposition that the University is a state actor in various opinions of the courts. Each of these, however, is distinguishable from the case at bar or supports a finding contrary to the one Plaintiff seeks. [R. 42 at 10]. For example, *Spark v. Catholic Univ. of America*, 510 F.2d 1277 (D.C. Cir. 1975), declined to find state action

on behalf of a private university, even where that private university received public funding. "The fact the Federal Government contributes funds to the University, by itself, is insufficient to show the exercise of influence on University decision-making or the encouragement of specific policies."[1] *Id.* at 1282; *accord Rendell–Baker v. Kohn*, 457 U.S. at 840. *Belk v. Chancellor of Washington Univ.*, 336 F. Supp. 45 (E.D. Mo. 1970), dealt with the suppression of the educational opportunities of a general student body where there was no basis to do so, not with the discipline of a specific, troubled student. *Id. Brown v. Strickler*, 422 F.2d 1000 (6th Cir. 1970), pertained to the University of Louisville, which is an entirely public university, unlike the University of Pikeville, which is entirely private. [R. 37-1 at 2 ¶ 2]. And *Lansing v. City of Memphis*, 202 F.3d 821 (6th Cir. 2000), applying *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982)—as discussed—leads to the determination that the University was not engaged in state action, at least not in this particular case. As such, neither the Fourteenth Amendment nor Section 1983 can be said to apply. Not even under the cases Plaintiff cites in his favor.

### III. COUNT THREE: SECTION II OF THE KENTUCKY CONSTITUTION

Plaintiff's final claim arises under Section II of the Kentucky Constitution. "Article II of the Kentucky Constitution prohibits arbitrary and capricious conducted (sic) by the Defendant," [R. 1-1 at 5 ¶ 34]; "[t]he Defendant['s] application of the student code is (sic) a desperate (sic) manner toward the Plaintiff was arbitrary and in violation of the student code adopted by the Defendant," [*Id.* at ¶ 34]; "[t]he conduct of the Defendant violated Article II of the Kentucky Constitution," [*Id.* at ¶ 36]; "[a]s a result of the Defendant's arbitrary conduct the Plaintiff has

---

[1] Plaintiff cites the various instances of state funding the University has received, and Plaintiff also notes that the College is at least in part regulated by the state. [R. 42 at 10–11]. This fails to overcome *Rendell-Baker*, which found a private school to be a private actor even where "nearly all" of the students were referred by a state agency, the school was heavily regulated under state laws, and public funding "accounted for at least 90%, and in one year 99%, of [the] school's operating budget." *Rendell–Baker*, 457 U.S. at 830–32 (1982).

suffered economic loss as well as embarrassment and humiliation," [*Id.* at 6 ¶ 37]. As such, Plaintiff prays that this "Court find that the Defendant's conduct was arbitrary in violation of Article II of the Kentucky Constitution." [*Id.* at ¶ 4]. This argument, however, like Plaintiff's argument that the Fourteenth Amendment should apply, fails as a matter of law.

Section II of the Kentucky Constitution provides "[a]bsolute and arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority." K.Y. Const. § 2. This provision is understood as a procedural due process guarantee, applicable exclusively to actions fairly attributable to the state. *Commonwealth Natural Res. and Env't Prot. Cabinet v. Kentec Coal Co., Inc.*, 177 S.W.3d 718, 724 (Ky. 2005). Section II of the Kentucky Constitution ensures that "the state is enjoined against arbitrariness." *Id.* This guarantee under the Kentucky Constitution is generally understood to be construed consistently with the Fourteenth Amendment to the United States Constitution. *See Smith v. O'Dea*, 939 S.W.2d 353 (Ky. App. 1997). Thus—like the Fourteenth Amendment and Section 1983—Section II of the Kentucky Constitution has no application. The University is not a state actor. *See id*; *Rendell–Baker v. Kohn*, 457 U.S. 830, 830–32 (1982); [R. 37-1 at 2 ¶ 2]. As such, Plaintiff's claims under the Kentucky Constitution must fail. Defendants are entitled to summary judgment.

## **CONCLUSION**

"[T]he existence of a mere scintilla of evidence in support of the non-moving party's position will not be sufficient; there must be evidence on which the jury could reasonably find for the non-moving party." *Sutherland v. Mich. Dept. of Treasury*, 344 F.3d 603, 613 (6th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Plaintiff has failed to allege a prima facie case under the Kentucky Civil Rights Act. K.R.S. § 344.010 *et seq.*; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Likewise, Plaintiff has failed to show the presence

of state action required for the application of the Fourteenth Amendment, 42 U.S.C. § 1981, and Section II of the Kentucky Constitution. *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982); *Smith v. O'Dea*, 939 S.W.2d 353 (Ky. App. 1997); [R. 37-1 at 2 ¶ 2].

Thus, for the reasons discussed, based on the undisputed facts, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgement, [R. 37], is **GRANTED**. **ALL** of Plaintiff's claims against Defendants, [R. 1-1], are **HEREBY DISMISSED WITH PREJUDICE**.

This the 13th day of October 2017.

Signed By:
*Edward B. Atkins* /s/ EBA
United States Magistrate Judge